ALBERT PAUL SMITH *et al.*

*v.*

FRANKLIN DENNISON, Receiver, etc.

*Filed at Ottawa June 20, 1881—Rehearing denied September Term, 1881— A second petition for rehearing dismissed March Term, 1882.*

1. EVIDENCE—*credibility, when contradictory statements are shown.* Although contradictory statements by a witness as to immaterial matters may tend to cast suspicion upon his testimony, they will not authorize its entire rejection, when he is corroborated by another witness, and not contradicted by any other evidence in the case.

2. ASSIGNMENT FOR THE BENEFIT OF CREDITORS—*what constitutes— rights under a transfer as between partners.* Where one partner transfers and delivers to another all the assets of the firm, to collect the debts due the firm and pay and discharge its liabilities, giving such managing partner

all the powers possessed by both, for the purpose of settling the partnership affairs and a division of the proceeds after payment of the debts, this is not an assignment for the benefit of creditors of the firm, but one for the benefit of the parties, and will not prevent the partner taking the assignment from securing one creditor to the prejudice of others.

3. COLLATERALS—*may be given to secure more than one debt.* Where a firm has given collaterals as security for a loan, and procures a further loan upon additional collaterals, the firm may, in obtaining such new loan, contract with the person advancing the money that he may hold the securities as collateral to both debts, or his entire claim.

4. PARTNER—*his power to pledge collaterals for money.* Where one partner entrusted with the winding up of the business of the firm was authorized, by agreement, to trade any part of the assets, and to do all and everything for settling its affairs that might be deemed expedient, it was *held*, that such partner was authorized, on borrowing money to pay a liability of the firm, to pledge notes of the firm as collaterals to secure not only the new indebtedness so created, but also a prior indebtedness of the firm to the same creditor.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on writ of error to the Superior Court of Cook county; the Hon. S. M. MOORE, Judge, presiding.

Frisbie and Rappleye were partners, doing business as such, in Chicago. John Seely Wallace was the father-in-law of Rappleye. The firm borrowed money from Wallace, and having made some payments had a settlement with Wallace, and on the 28th of December, 1875, found the balance due Wallace was $7662.44, and on that day gave him the note of the firm for that amount, payable in ninety days, with ten per cent interest until paid, and at the same time deposited with him other notes of other persons as collaterals to secure the payment of the note to Wallace.

On the 18th of April, 1876, this firm stopped business, and an agreement was executed between Frisbie and Rappleye that Rappleye should wind up the business, collect the assets, and from the proceeds pay the firm debts, if the assets were sufficient; that in payment of the debts, when any assets

can, in the judgment of Rappleye, be better disposed of without first being converted into money, or can be traded to secure that end, he shall pursue that course; and finally agreed that all the assets and property should be turned over to Rappleye, and declared that the same were thereby transferred, indorsed and assigned to him, "as trustee, for the purposes mentioned," that is to say, "realizing the most out of the same, and paying the debts;" and Frisbie authorized Rappleye "to do all and every the matters and things that may be necessary or expedient in settling the affairs of the firm;" and that after the payment of all of the debts the balance of the money or assets on hand should be divided equally between the parties. Frisbie was to give his advice and assistance in the settlement of the affairs, and neither of them should charge or receive any compensation for his services.

On the 20th of April, 1876, the firm having not long before collected money as agents of an eastern insurance company, and improperly applied the same to their own use, Rappleye borrowed from Wallace $4539.16 for the purpose of discharging that liability of the firm to the insurance company, and gave to Wallace a promissory note, signed "Frisbie & Rappleye," for that amount, payable on demand, with interest at the rate of ten per cent per annum until paid, and deposited with him notes of other persons, payable to the firm, as collaterals to secure the payment of the same. Afterwards Frisbie was informed that Wallace held these, and made no objection thereto. In the language of the witness, "he neither assented nor dissented."

At the August term, 1876, of the circuit court, Frisbie filed a bill in chancery against Rappleye & Wallace, charging that Rappleye was collecting of the assets of the late firm moneys, and using the same in his own private business, and not applying the same to the payment of firm debts, and charging that Rappleye induced him to make the agreement

of April 18, 1876, by representing to him that Wallace would, in such case, "at once come to his aid with such pecuniary assistance as would enable him, with said assets, to pay off the debts and wind up the business;" and charging that Rappleye, in bad faith, had turned over to Wallace a large amount of notes belonging to the assets of the firm, as collateral and additional security to Wallace upon an old debt, which was already fully secured by other collaterals sufficient in value to pay the old debt, and that the old debt was without consideration; that Wallace had not assisted Rappleye in paying off the debts, as Rappleye said he would; that the indebtedness of the late firm to Wallace has not increased except by the interest, and that said securities were placed in Wallace's hands to deprive him and the creditors of the late firm of the same, and for the personal benefit of Rappleye, and cheating Frisbie out of the same, and that Rappleye had no authority to make such use of the assets; that the securities so held by Wallace are excessive, and that Rappleye was insolvent, and asking that that agreement be set aside, and the affairs of the firm settled by having a receiver appointed, and that Wallace be required to surrender the collaterals, and praying for a temporary injunction. That suit was afterwards dismissed by the complainant therein.

This suit was instituted in January, 1877, and is a bill in chancery, brought against John Seely Wallace, by Dennison, stating that judgments had been rendered against Rappleye & Frisbie, one in favor of one Sutor, and one in favor of one Eldred, and that upon creditors' bills filed by these judgment creditors, complainant had been appointed by the court receiver of the assets of said judgment debtors, and charging that before and at the time of filing this bill Wallace had in his possession and custody securities belonging to Frisbie & Rappleye, which he claims to hold as collateral security upon certain indebtedness of Frisbie & Rappleye upon certain

notes; that such pretended indebtedness is merely colorable, and no consideration ever existed for the same, and claiming that complainant is entitled to the custody of such collaterals, and asking an account of the same may be taken, and if it should appear that Wallace has any lien upon the same, that the amount thereof may be ascertained, ·that complainant may redeem. Wallace answered the bill, setting out the two principal notes above mentioned, and a list of the collaterals deposited with him at the giving of the first note, and also a list of the collaterals deposited with him at the giving of the second note, and stating, at the time of loaning the money for which the last note was given it was a part of the agreement (and the inducement on which he acted) that he should retain "all of said collaterals, and proceeds thereof, until the amount of all his indebtedness, represented by the two principal notes, should be fully paid." To this answer was filed a replication, and the case was heard on the pleadings and proofs.

Pending the suit, all the collaterals remaining in the hands of Wallace, and not collected, were by consent placed in the hands of complainant, as receiver, for collection, without prejudice to the ultimate rights of either party.

The Superior Court, on final hearing, found the equities in favor of complainant, and held that Wallace was not entitled to apply any of the proceeds of the collaterals deposited at the making of the last note upon the indebtedness evidenced by the first note, and held that he should account to complainant for all proceeds of such collaterals in excess of the amount due upon the last note, instead of applying the same towards the payment of the first note. After the death of Wallace the case was taken to the Appellate Court by his legal representatives, and there the decree of the Superior Court was affirmed. To reverse that judgment of the Appellate Court this writ of error is brought.

Messrs. Small & Moore, for the plaintiffs in error:

1. Where a promissory note, to which other notes are deposited as collateral security, contains a provision authorizing the payee to sell the collateral notes at his discretion, and apply the proceeds to the payment of the principal note, but is silent as to the disposition to be made of the surplus of such collaterals after the principal note is paid, the application of such surplus, with the maker's consent, to the payment of another indebtedness owing by the maker to the payee, will be upheld against other creditors of the maker, if no fraud is shown. In such a case, if a contest arises as to the application of the surplus of collateral notes, the proceeds thereof, the creditor having the superior equity will prevail, or "where the equities are equal, the first in time is the first in right." Adams' Equity, 148; Bispham's Equity, 50.

2. The equitable title to a promissory note may, and often does, pass by mere delivery. *Garvin* v. *Wiswell*, 83 Ill. 215.

3. In the absence of a provision in the principal promissory note requiring the surplus of collateral notes to be returned to the maker of the principal note, after it is paid, the law would presume such a duty to be cast upon the payee; but such a presumption may be rebutted by parol evidence of an agreement, contemporaneous with the principal note, that such surplus of collaterals should be applied to the extinguishment of another indebtedness owing by the maker to the payee. All presumptions may be rebutted by parol testimony. *Davenport* v. *Mason*, 15 Mass. 89; *Barker* v. *Prentiss*, 6 id. 433; 1 Greenleaf on Evidence, sec. 484 a; 2 Parsons on Contracts, p. 553; 3 id. p. 280; *Jeffrey* v. *Walton*, 1 Starkie, 267; Story's Eq. Jur. secs. 1202, 1531.

4. A receiver, appointed in supplementary proceedings, to enforce the claims of certain judgment creditors for certain fixed sums against the estate of an insolvent debtor, is limited in his recovery to an amount sufficient to cover such

claims, and interest, together with the costs of the proceeding. *Bostwick, Receiver, v. Menck,* 40 N. Y. 383.

The receiver's right of action in such cases is "precisely such as the creditors themselves might have maintained, and no more." High on Receivers, sec. 455.

Mr. J. L. HIGH, for the defendant in error:

1. The dissolution of the partnership terminated the power of both partners, and Rappleye had no authority thereafter beyond that specified in the articles of dissolution. By those articles he was made a trustee for all the creditors, without priority, and no power or authority was conferred upon him to secure one creditor to the prejudice of the others. He could not use the firm name in giving new obligations, and had no authority to pledge the firm assets. Story on Partnership, sec. 322; 3 Kent's Commentaries, 63, and notes; *Hicks* v. *Russell,* 72 Ill. 230.

2. The existence of a former debt due to Wallace did not authorize him to apply thereon the securities received for the subsequent debt. The mere existence of another debt does not authorize the pledgee to detain the pledge as security for that debt, unless such was the intention of the parties. Story on Bailments, sec. 304; 2 Kent's Commentaries, 584.; *Baldwin* v. *Bradley,* 69 Ill. 32; *Jarvis* v. *Rogers,* 15 Mass. 389.

Mr. CHIEF JUSTICE DICKEY delivered the opinion of the Court:*

Two questions are presented for decision in this case: First, the question of fact, whether the collaterals deposited at the making of the note of April 20, 1876, were pledged as collaterals in Wallace's hands to secure not only that note, but also to secure the payment of the preëxisting debt

---

*At the time this opinion was delivered Mr. Justice DICKEY was Chief Justice.

upon the note of December 28, 1875; and second, whether Rappleye had lawful authority to make such pledge, if it were in fact made.

After a most careful consideration of the evidence on the subject, we are brought to the conclusion that the pledge was in fact made to secure both of these notes. Wallace and Rappleye both swear positively that this is the truth, and no witness contradicts them in this respect. Not only so, but there is such inherent evidence of the truth of this testimony arising out of the circumstances of the case, as to give great strength to it. Rappleye and his partner were not in harmony. The affairs of the firm had just been turned over to Rappleye for management. The money of the insurance company had been wrongfully applied to the payment of a debt of the firm, in the expectation that the demand of the insurance company could be met by money expected from another source. Rappleye, in his solicitude to get rid of a partner not in harmony with him, had (as Frisbie claims) represented to him that if he alone had the management, Wallace (his father-in-law) would furnish the ready money necessary to carry the debts of the firm until their resources could be made available. He may have hoped that this would be so. When applied to for a further loan, however, Wallace was found to be very cautious, and probably somewhat suspicious as to the discretion and capacity for success of his son-in-law. He was not disposed to lend any more money in that direction, but was at length induced to do so by the consideration that the collaterals offered were more than sufficient for the present loan, and he would thereby strengthen his security upon his first note. The conversations and discussions on this subject, sworn to in detail by both Wallace and by Rappleye, are so natural and probable, and so fully in harmony with the ordinary course of affairs with men of like relative conditions under similar cir-

cumstances, as to render it very improbable that they could have been invented in all their details.

It seems to be supposed by counsel for the receiver that certain circumstantial evidence in the case rebuts the conclusion that Rappleye had agreed with Wallace that he might retain these notes as collateral to the old debt as well as to the new, and for this purpose the fact is supposed to be established that in the chancery suit of Frisbie, both Wallace and Rappleye made oath that these collaterals were held by Wallace for the new debt only, and for no other debt, and that in a prosecution against Frisbie, instituted afterwards, Rappleye so testified. It may be conceded that Rappleye did so swear, but he now swears that his former statements were not correct on this question. This identical question now presented was not a material question in issue in either of those cases. The substantial allegations on which the chancery suit was based were, that the assignment of these collaterals was made *without* consideration, and that the first debt was fictitious and fraudulent, and not real, and if real, was already well secured, and hence the pledge for the old debt was unwarranted. The material allegation of the answer in that case was, that the pledge was made to secure the new debt, of which Frisbie had made no mention. The material question was not whether the pledge extended over the old debt, but was whether it rested upon a real, valid, subsisting debt. It was material to show the new debt, and the pledge therefor. This being shown, it was not material in that case whether the pledge covered the old debt or not. Rappleye's affidavit and his testimony, therefore, were not as to matter material to the issues in the proceedings in question. These circumstances, therefore, are not sufficient to authorize the rejection entirely of the testimony of Rappleye in this case. Contradictory statements by a witness as to immaterial matters do tend to cast suspicion upon the testimony of a witness, but do not authorize its entire rejection, where he is corroborated

by another witness, and not contradicted by any evidence in the case.

As to the claim that Wallace made any statement in his affidavit at variance with his present testimony, it is not sustained. The only evidence on this question is that of Mr. Cooper, who drew the affidavit of Wallace, referred to. He says as to Wallace's affidavit, that it was *about* the same as that of Rappleye. This was the recollection of Mr. Cooper as to the contents of an affidavit drawn by him in another suit, near three years before he gave his testimony. An examination of Rappleye's affidavit, referred to by the witness, shows that it contains nothing directly on the question as to whether Wallace had an agreement from Rappleye to hold these securities as collateral to the first note. There is one expression which contains that idea by implication. There is nothing in this record indicating that Mr. Wallace was not a man of unquestioned standing in the community as a man of wealth, caution and integrity. He was not interrogated at all as to this affidavit. We are satisfied his testimony in this case is true.

The next question relates to the power of Rappleye to pledge these collaterals to secure the first debt. Counsel for the receiver seems to construe the contract of April 18, 1876, between Frisbie and Rappleye, as an assignment of the assets of the firm for the *benefit of creditors*, and hence insists that Rappleye became "a trustee for all the *creditors*, without priority," and that he therefore had no power or authority to secure one creditor to the prejudice of others. In the absence of this agreement between these partners, it will not be denied that Frisbie and Rappleye, in winding up their affairs, could have made a valid contract with Wallace that if he would make the second loan he might hold the securities as collateral to both debts, or to his entire claim. This contract differs from an ordinary assignment for the benefit of, *creditors* in its whole character and structure. It was made for

the benefit of *the parties* to it, and Rappleye was given the largest powers and discretion. The end to be accomplished for the benefit of the parties was, that the debts and liabilities should be extinguished out of the assets, without sacrifice of the assets, and. a surplus divided. To "secure that end" Rappleye was authorized "to trade any part of the assets, and to do all and every the matters and things that may be * * * expedient in settling the affairs of the firm." It was plainly the design and effect of this contract to clothe Rappleye with powers to this end equal to the combined power of both Frisbie and Rappleye,—that he was to be in that regard in full the representative of the late firm. Frisbie plainly understood that Rappleye had power in some way to borrow money, for in his bill he said he was expected to get advances from Wallace, and his complaint was that this was not done; and he also understood that Rappleye had power to pledge assets to secure old debts, even without any new consideration. He was told by Wallace that he held this second parcel of securities. At that time he did not know of the new loan by Wallace, and yet he made no objection and did not then find any fault with the arrangement.

In an ordinary assignment to a trustee for the benefit of creditors, the title to the assets is passed from the debtors, so that the same can not be reached by creditors except by virtue of their rights under the assignment. Here the title was placed in Rappleye, and in his hands these assets were as open to appropriation by creditors as if the assignment had not been made. Their rights were in no way affected by the transfer. The object and legal effect of this contract was that the prosecution of the business should cease, and that Rappleye should have vested in him all the powers which both the partners would otherwise have had in the management of the property, to the end that they should both be relieved from liability as debtors. This case does not involve the question of the personal liability of Frisbie

upon the last note. The validity of the debt for which that note was given, and of the note as the note of Rappleye, may be, and no doubt is, involved. Rappleye had authority to apply the assets to pay the debt of the insurance company, or to pledge assets in its security to procure extension of time for the payment thereof; or, under the powers given in the agreement, he had power to borrow money to pay that debt, upon his own note, and pledge the assets in security, if the pledgee was given no power to sell the assets in violation of the limitations in the agreement. Treating, then, this new note merely as the note of Rappleye alone, it is a debt of such character that the pledge of collaterals was in that regard valid.

The remaining question relates to Wallace's right to a lien on the collaterals for the payment of the first note. Obviously Frisbie understood that he had by this contract clothed Rappleye with power to pledge assets to secure the payment of old debts. He was told by Wallace that he held this second parcel of securities. At that time he did not know of the new loan, and yet he made no objection thereto. Afterwards, when he got the notion that this first indebtedness was not real, he filed his bill charging that there was no foundation for this old indebtedness, that it was merely colorable, and that Rappleye had no lawful authority to pledge the collaterals to secure a fictitious claim of indebtedness.

We are fully convinced that the pledge was made as claimed by Wallace, and that in equity Wallace's estate should be fully paid from the proceeds of the collaterals in question, before the application thereof to any other debts of the late firm.

The judgment of the Appellate Court is therefore reversed, and the decree of the Superior Court of Cook County is also reversed, and the cause remanded to the Appellate Court, to be remanded thence to the Superior Court, with directions to enter there a decree in conformity to the views herein expressed.    *Judgment reversed.*

Mr. JUSTICE WALKER: I concur in the conclusion reached, but not in all that is said in the opinion.

Mr. JUSTICE MULKEY, dissenting:

Ordinarily, when I am unable to agree with the majority of the court in the decision of a case, I am content to simply place myself upon the record as dissenting, and sometimes I do not even do that. But inasmuch as the conclusion reached in the present case seems to me to be not only destitute of any authority even tending to support it, but in direct conflict with well recognized principles founded upon an unbroken current of authority, I feel it due to myself, as a member of the court, to do something more than merely mark myself as dissenting.

With respect to the collaterals given with the note of the 28th of December, there is no ground for controversy. It is conceded that the note was given for money loaned by Wallace to Frisbie & Rappleye, in the usual course of business, and the makers had a perfect right to secure it in the manner they did. Indeed no question is made upon the argument with respect to Wallace's right to the collaterals given with this note. The whole controversy is confined to the right to give the subsequent note, and the disposition sought to be made of the collaterals accompanying it. This note, it will be remembered, was executed by Rappleye in the name of the firm, two days after the dissolution of the partnership between Frisbie and Rappleye, Wallace at the time having notice of such dissolution. It is conceded the note was given for loaned money, which was used by Rappleye in the payment of a partnership debt, yet defendant in error questions the power of Rappleye to execute it so as to bind the firm or the partnership effects. While the authorities are not altogether harmonious as to the power of partners after dissolution to bind one another by new engagements, yet the general doctrine, as shown by the decided weight of

authority, unquestionably is, that notwithstanding the disso-
lution the partnership still exists, *sub modo*, for the purpose of
collecting and paying the debts of the firm, and of doing such
other acts in the regular course of business as are necessary
to winding it up. The power of disposing of the partner-
ship effects for these purposes exists practically to the same
extent as it did before dissolution. Whatever is essential to
the winding up of the business of the firm, as contradistin-
guished from what might be deemed politic, desirable or
expedient, may be done, and nothing more. Parsons on
Partnership, (2d ed.) 388, side page; *Hicks* v. *Russell*, 72 Ill.
230. As contracts of sale are essential to the disposition of
the partnership property, whereby the necessary means may
be raised for the payment of debts, they may be made as
well after as before dissolution; and this power to sell, as a
general rule, includes the power to mortgage or pledge the
partnership property, yet this power may, and often is, modi-
fied or limited by agreement of the parties. Herman on
Chattel Mortgages, sec. 118; 5 Wait's Actions and Defences,
127.

In the application of the general rule that each partner,
after dissolution, has the right, where the same has not been
relinquished by special agreement, to enter into such con-
tracts and engagements as are necessary to the closing up of
the partnership business, it is generally held that a partner,
after dissolution, has no implied power to give a note or
other negotiable security in the firm name, even for a pre-
existing debt, and such is the doctrine of this court. Parsons
on Partnership, 391; *Hicks* v. *Russell*, 72 Ill. 230.

If such be the rule with respect to antecedent indebtedness,
it must be conceded that it applies with greater force to an
indebtedness created after such dissolution. It is believed
that no decision of any respectable court can be found hold-
ing that a partner, after dissolution, can, by virtue of any
implied authority arising out of his relation to the dissolved.

partnership or the partnership effects, go into the market, borrow money, and execute in the partnership name a note or other negotiable security therefor, so as to bind the other partners or the partnership effects, where the party advancing the money and taking the note or other security has notice of the dissolution of the partnership. Whether in such case, where the money thus procured has been applied in the discharge of a preëxisting firm debt, the party lending it will in equity be subrogated to the rights of the creditor, as against the firm whose debt has been liquidated by the loan, is a question which does not arise upon this record, and about which it would be useless to express an opinion.

It follows, from what I have already said, that Rappleye had no authority either to borrow the money advanced by Wallace on the 20th of April, or to execute the note given therefor, and if the partnership was not bound thereby, it is difficult to see on what principle Wallace could hold the collaterals. The note in question, then, was in law simply the individual note of Rappleye, and Wallace, having actual notice of the dissolution of the partnership, is conclusively presumed to have known that Rappleye, after such dissolution, had no implied power, by reason of existing relations to Frisbie, to execute a note or borrow money so as to bind the latter, and that under the circumstances Rappleye alone was bound. This being so, Wallace was not warranted in relying upon the firm for payment, except so far as he might be subrogated to the rights of the insurance company, whose debt against the firm was liquidated with the money advanced by him to Rappleye; nor was he authorized to receive in pledge the securities or collaterals given to him by Rappleye with that note. It was a misappropriation of the partnership effects, in which Wallace personally participated, with express notice of such facts as in law showed the transaction unwarranted.

There is another view of this case, however, equally unfavorable to plaintiffs in error. At the time of the dissolution

35—101 ILL.

the partnership was insolvent, and Frisbie had an unquestioned right to provide for an equal division of the assets of the concern among the creditors, according to their respective demands. As a partner he had a lien in equity upon these assets, as well for his own indemnity against personal liability for the debts of the firm, as for his proportion of any surplus that might be coming to him after payment of the debts. Having these rights, by the articles of dissolution he "*transferred*" and "assigned" to Rappleye, "as trustee," his entire interest in the partnership effects "*in trust,*" to "collect the assets of the firm, and from the proceeds thereof pay the firm debts in full," provided the assets were sufficient for such purpose. It will be observed that this instrument contains apt and appropriate words of conveyance and transfer, and by it Rappleye clearly acquired the exclusive legal title to all the partnership property, subject to the trusts upon which the transfer was made. Upon the execution and delivery of this instrument an express trust was thereby created, not only in favor of Frisbie himself, but also in favor of all the creditors of the firm. By virtue of it each creditor became entitled to share in the proceeds of the partnership estate in proportion to the amount due him, and it was not in the power of the trustee to hypothecate to one having notice of the trust, a portion of the assets, to secure the claim of one creditor so as to give him a preference over the others. Wallace himself states that he knew of the dissolution at the time of the giving of the last note and the transfer of the collaterals accompanying it, and the evidence satisfactorily shows that he was made acquainted with the terms of the dissolution. Indeed, there is no claim on the part of either Rappleye or Wallace that the latter did not fully understand the terms upon which the partnership was dissolved, and by which Rappleye was given exclusive control of its affairs for the benefit of the creditors, as already shown. Assuming, then, that these collaterals were given, as is claimed by Wal-

lace and Rappleye, to secure the first as well as the last note, it is manifest that in so far as they were given to secure the first note, it was in effect giving Wallace a preference over other creditors, which was a violation of the trust, in which Wallace personally participated, and from which he is not permitted to derive any advantage. There is nothing in the instrument to warrant the attempted preference. By its terms all the creditors are put upon terms of perfect equality, and it was the duty of the trustee to so execute the trust as to effectuate the clearly expressed intention of the parties in that respect. The partnership effects having been conveyed in trust to Rappleye in the manner and for the purposes we have seen, it was not necessary for a creditor of the firm to first go into a court of law to establish his claim, and could not by doing so thereby obtain an advantage over other creditors who did not see proper to take that course. The assignment in question brings the case directly within one of the exceptions to the general rule that a party must first exhaust his remedy at law before going into a court of equity. 2 Perry on Trusts, sec. 594; *Steere et al.* v. *Hoagland et al.* 39 Ill. 264; Hill on Trustees, 518, side page.

The members of a partnership, either before or after dissolution, may, where no statutory provisions intervene, like other persons who sustain no such relation to each other, make a partial or total assignment of the partnership effects in such manner as to give a preference to one or more of their creditors. This right of partners to prefer creditors in disposing of their property, rests upon the ground that their ownership and power of disposition are as unlimited and absolute as that of persons sustaining no such relation to each other. (2 Leading Cases in Equity, 395, and authorities there cited; *Reeves* v. *Ayers*, 38 Ill. 418.) It has been supposed that the creditors of a partnership, particularly after dissolution, have something in the nature of an equitable lien upon the partnership effects; but such is not the case.

(2 Leading Cases in Equity, 396.) But where the partnership has been dissolved by the death of one of the partners, the survivor will in equity be regarded as a trustee of the partnership property, for the benefit of the partnership creditors as well as the legal representatives of the deceased partner, and in such case the former have an equity, arising out of the lien of the partners upon the partnership effects, as above mentioned, by which they are entitled to payment of their claims before any part of the partnership assets can be applied to the payment of the individual creditors of the partners. And in such cases the assets being insufficient to pay the full amount of the claims of the partnership creditors, they are to be paid *pro rata*. *Reeves et al.* v. *Ayers, supra;* 2 Leading Cases in Equity, 396; Parsons on Partnership, 441, *et seq.; Hapgood* v. *Cornwell*, 48 Ill. 64; *Ladd* v. *Griswold et al.* 4 Gilm. 25.

The Superior Court, in disposing of this case, doubtless proceeded upon the theory that Rappleye had authority to make the loan and hypothecate the collaterals for the payment of both notes, but found, as a matter of fact, they were pledged for the payment of the last note only, and admitting the law to be as is assumed upon that theory, the decree was clearly right. Upon that theory, the whole case turned upon a pure question of fact, which the court found adversely to plaintiffs in error, and upon a careful consideration of the evidence it is difficult for me to conceive how they could have reached any other conclusion. It is true that in this suit, near three years after the alleged hypothecation, Wallace and Rappleye both swear positively that the collaterals in question were given to secure both notes; but it is equally true that they both swore just as positively, in another proceeding only a few months after the transaction occurred, when the circumstances must have been fresh in their minds, that they were given to secure the second note only. Besides, Mr. Young, who was present when it is claimed that there

was a verbal understanding between them that the collaterals were to apply to both notes, swears that he heard nothing of the kind pass between them, and that it was not till months afterwards he heard Rappleye say there was some kind of an understanding to that effect, but that he, Rappleye, could not tell whether it was in writing, or otherwise give any distinct or satisfactory account concerning it. Moreover, the instrument of hypothecation which was executed at the time, shows upon its face that these collaterals apply exclusively to the last note, and that no reference whatever is made to the first note. In view of these facts I am at a loss to see how the Superior Court could have come to any other conclusion than that which it did, upon that question.

But the consideration which, in my judgment, is absolutely conclusive of this case, is the fact, already shown, that upon the dissolution of the partnership Frisbie conveyed the entire partnership effects to Rappleye in trust, for the benefit of the partnership creditors, and under such assignment Rappleye had no power to so dispose of the assets of the firm as to give one creditor a preference over another, especially when such preferred creditor had notice of the assignment, as is shown to have been the case here. It is true, the mere retirement of one partner upon the dissolution of the firm, with the understanding that the other partner shall collect and pay all debts, and have the exclusive control and management of the partnership effects in winding up the business of the partnership, will not have that effect, for the reason such an agreement as that does not transfer the legal title in the partnership effects from one partner to the other, and hence no express trust is thereby created. But in the present case the legal title of Frisbie to the partnership effects passed to Rappleye, and the latter became thereby converted into a trustee, like any other assignee, for the benefit of creditors. That such is the legal effect of the assignment to Rappleye, is fully sustained by a number of well-considered cases, and

no authority has been produced, nor is it claimed that any such exists, even tending to sustain a contrary view. *Sedam et al.* v. *Williams et al.* 4 McLean, (Mich.) 51; *Wilds et al.* v. *Chapman et al.* 4 Edw. Ch. 669.

It follows, therefore, that Rappleye had no power to hypothecate the collaterals in question to secure the first of said notes. To do so was a fraud upon the other creditors of the firm, in which Wallace knowingly participated. If any error at all was committed by the Superior Court, it was in favor of plaintiffs in error, and they therefore have no right to complain of it.

For the reasons stated, I am clearly of opinion the judgment of the Appellate Court should be affirmed.

CRAIG and SCHOLFIELD, JJ.: We dissent from the opinion of the court, and concur in the foregoing opinion, of Mr. JUSTICE MULKEY.